IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BERNADETTE MERRIGAN,            :            CIVIL ACTION
                                :
             Plaintiff,         :
                                :            NO. 06-5289
       v.                       :
                                :
ARAMARK SERVICES, INC.,         :
                                :
             Defendant.         :

**MEMORANDUM**

Jones, J.                                            September 18, 2009


       Before the Court is Defendant ARAMARK Services, Inc.'s ("ARAMARK") Motion for

Summary Judgment (Doc. No. 14), Plaintiff Bernadette Merrigan's Response in Opposition

thereto (Doc. No. 15), and ARAMARK's Reply (Doc. No. 16.)  For the following reasons,

ARAMARK's Motion will granted.


I.      **Procedural History**

       On December 4, 2006, Plaintiff filed a Complaint against ARAMARK alleging that

ARAMARK unlawfully terminated her employment because of her gender and race (Count I),

subjected her to a sexually hostile atmosphere and sexual harassment (Count II), and retaliated

against her when she complained about ARAMARK's allegedly unlawful employment practices

(Count III).  Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e, *et seq*. ("Title VII").  On January 4, 2007, ARAMARK filed an Answer to the

Complaint.  On November 8, 2007, ARAMARK filed a Motion for Summary Judgment on all

three counts of the Complaint.  On December 7, 2007, Plaintiff filed a Response in Opposition to

ARAMARK's Motion.  ARAMARK filed a Reply on December 21, 2007.  This matter was reassigned to my docket on April 28, 2009.

On May 20, 2009, counsel for Plaintiff petitioned the Court for leave to withdraw as counsel of record, stating that she has been unable to locate Plaintiff.

## II.   Factual Allegations

The Court recites the facts as viewed in the light most favorable to Plaintiff.

From approximately October 6, 2002, to January 19, 2006, Plaintiff, a Caucasian woman, was employed by ARAMARK at its on-site dining operation at the NFL Films facility in Mount Laurel, New Jersey.  (Def.'s Mem. in Supp. of Mot. For Summ. J. ("Def.'s Mem."), Ex. A,  Dep. of Bernadette Merrigan ("Merrigan Dep.") 9, 12, 30.)  Plaintiff was first employed by ARAMARK as a cashier but transferred to the position of "Deli worker/Prep cook" in October 2003.  (Merrigan Dep. 30-33, 40.)  In this capacity, Plaintiff prepared the deli counter, prepared the salad bar, and assisted with catering.  (Merrigan Dep. 31.)

As a deli worker, Plaintiff was supervised by Executive Chef Nick Vaccaro, a Caucasian man.  (Merrigan Dep. 40-42.)  Plaintiff and Vaccaro reported to Food Service Director Christopher Husenica, a Caucasian man.  (Merrigan Dep. 40-42; Def.'s Mem., Ex. B, Dep. of Christopher Husenica ("Husenica Dep.") 15-16.)  Plaintiff's supervisors, Husenica and Vaccaro gave directions, assigned work and evaluated Plaintiff's performance.  (Husenica Dep. 15-16; Def.'s Mem., Ex. C, Dep. of Nick Vaccaro ("Vaccaro Dep.") 10-11, 17.)  Plaintiff's file contained two "write-ups":  one from December 7, 2004, regarding proper sanitation and clean-up procedures at her deli station and another from August 16, 2005, regarding the need for

Plaintiff to work more efficiently.  (Pl.'s Resp. in Opp'n to Summ. J. ("Pl.'s Resp."), Ex. D.,

Dep. of Nick Vaccaro II ("Vaccaro Dep. II") 40-41.)  In October 2005, after her evaluation

showed that she had improved and increased production, Plaintiff was given the maximum raise

plus an additional two percent.  (Vaccaro Dep. II 63.)

    Plaintiff's co-workers included two African American males: Jesse Copling, a grill cook,

and Larry Hunter, a dish washer.  (Merrigan Dep. 37-40.)  Copling began working for

ARAMARK in either 2004 or 2005.  (Merrigan Dep. 37-38; Husenica Dep. 21-22.)  Prior to

September 5, 2005, Plaintiff had no problems with Copling, Hunter, or anyone else at the NFL

Films location.  (Merrigan Dep. 39-40, 43.)  Plaintiff was friendly with Copling, took cigarette

breaks with him, and sometimes gave him rides to work in the morning if she saw him walking

from the bus stop.  (Merrigan Dep. 38-39, 44; Husenica Dep. 42-43.)

    On September 5, 2005, Plaintiff saw Copling walking to work and picked him up in her

car.  (Merrigan Dep. 44.)  They drove to work together and went about their day as normal.

(Merrigan Dep. 44.)  At the end of the day, Copling told Plaintiff that he had left something in

her car, so Plaintiff gave Copling her car keys so he could retrieve his property.  (Merrigan Dep.

44.)  Later that evening, when Plaintiff returned to her car to go home, she discovered that a ten-

dollar bill was missing from her purse, which she had left in her car.  (Merrigan Dep. 45.)  When

Plaintiff discovered that the money was missing, she immediately told Husenica, who was in the

parking lot at the time.  (Merrigan Dep. 45-46.)  Husenica mentioned that Copling had been in

Plaintiff's car that day, and said, "Well, I guess we both know where that money went."

(Merrigan Dep. 46.)  Husenica told Plaintiff that they would talk about the incident the next day,

and that Plaintiff should not mention anything to anyone.  (Merrigan Dep. 46.)  Husenica later

3

checked the surveillance tapes for September 5, 2005, and found that Plaintiff's car was out of view.  (Husenica Dep. 45, 170-171, 177-78.)  Husenica told Plaintiff that he would not accuse Copling of theft because he was not a police officer and that, if he accused Copling, he would have "a racial issue."  (Pl.'s Resp., Ex. A, Deposition of Bernadette Merrigan II ("Merrigan Dep. II") 53.)  According to ARAMARK's Employee Handbook, removal of property of another employee or a customer without permission may result in immediate discharge.  (Def.'s Ex. I, ARAMARK Employee Handbook at NFL Films ("Employee Handbook") 16.)  This provision applies when the theft is substantiated.  (Pl.'s Resp., Ex. C, Dep. of Christopher Husenica II ("Husenica Dep. II") 109.)  Husenica investigates accusations of theft when they occur in the building and on ARAMARK property.  (Husenica Dep. II 109.)  Husenica considered the September 5 incident not to be a work-related incident because, although the incident was on ARAMARK property, it was not in the building.  (Husenica Dep. II 44.)

After the September 5 incident, Plaintiff stopped giving Copling rides to or from the bus stop and stopped speaking to him other than for work-related issues.  (Merrigan Dep. 50-51.)  Copling also treated Plaintiff differently after September 5, 2005.  (Merrigan Dep. 51, 55, 60.)  He stopped speaking to Plaintiff.  (Husenica Dep. 58.)  His demeanor and actions toward her changed, and the changes were evident on a daily basis.  (Merrigan Dep. 55-56, 67.)  They no longer helped each other out at work.  (Merrigan Dep. 60, 64-65.)  Copling stopped preparing certain food items for Plaintiff's station, so Plaintiff either had to prepare the food items herself or get help from the chef.  (Merrigan Dep. 58-60.)  Before the incident, Copling and Plaintiff would clean up their stations and put their materials on the same cart, but after the incident Copling made a point to return the cart to the dish room before Plaintiff could load her materials

4

onto it.  (Merrigan Dep. 60-61; Vaccaro Dep. 19-20.)  The dish room was not far from Plaintiff's

work area, but Plaintiff would have to get the cart herself or carry all of her materials.  (Merrigan

Dep. 61.)  That could cause Plaintiff to spend up to an additional 10 minutes doing her job.

(Merrigan Dep. 62-63.)  After Plaintiff made allegations about the September 5 incident, Copling

also put all of his clean-up materials away without leaving them out for Plaintiff, and the same

thing happened in the morning.  (Merrigan Dep. 61-62.)  In addition, Copling told customers to

"give [Plaintiff] a hard time."  (Merrigan Dep. 62-64, 77-78, 117; Vaccaro Dep. 18-19.)   On

November 18, 2005, Copling used a cleaning solution called D-Lime,[1] which made Plaintiff

physically sick.  (Merrigan Dep. 64, 75-76.)  Copling had been told by someone not to use this

product once before.  (Merrigan Dep. 74-77.)

       Plaintiff never told Copling why she stopped socializing with him, but she believes that

Husenica or Vaccarro told Copling that she had made an allegation about him stealing.

(Merrigan Dep. 51, 55-56.)  Plaintiff could think of no other reason why Copling's behavior

toward her had changed.  (Merrigan Dep. 56-57.)

       Soon after the September 5 incident, Hunter's behavior toward Plaintiff also changed.

(Merrigan Dep. 57.)  Hunter was the dish washer at ARAMARK, and he was responsible for the

pots.  (Merrigan Dep. 63.)  Plaintiff made a point to put her pots on a low rack, where she could

reach them, but when she came into work in the morning she would find the pots were on a shelf

too high for her to reach.  (Merrigan Dep. 62-63; Vaccaro Dep. 18-19.)  Hunter also gave

Plaintiff threatening dirty looks that made her feel uncomfortable and unsafe, "like he was

looking right through [her]."  (Merrigan Dep. 71.)  Both Copling and Hunter made "snide

---

[1] The parties alternately refer to this cleaning product as D-Lime, Delime, or Lime Away.

comments" at or about Plaintiff and gave her "threatening dirty looks." (Merrigan Dep. 71, 117-118, 247-248.) Plaintiff does not know why Hunter's behavior toward her changed. (Merrigan Dep. 57.)

After the September 5 incident, Plaintiff complained on numerous occasions to Husenica and/or Vaccaro about the problems she had with Copling and Hunter. (See, e.g., Merrigan Dep. II 72-73, 82, 87, 121, 123; Merrigan Dep II 164-65.) Plaintiff told Husenica and Vaccaro that she did not feel safe or comfortable working at ARAMARK and that she wanted them to do something about how Copling and Hunter were treating her. (Merrigan Dep. II 72-73, 82, 87, 121, 123; Husenica Dep. 194, 198.) When Plaintiff complained about the cart issue, Husenica spoke with Copling, who said that it would not happen again, and Husenica documented the meeting. (Merrigan Dep. 60-61, 86, 88; Vaccaro Dep. 19, 44; Husenica Dep. 85-88.) Vaccaro did not hear anything further from Plaintiff about disputes regarding the cart. (Vaccaro Dep. 20, 36-37, 44.) Plaintiff asked Vacarro to ask Hunter not to put the pots on the top shelf. (Vaccaro Dep. 18-19. See also Merrigan Dep. II 165-66.) Husenica and Vacarro instructed Hunter to ensure that Plaintiff's work materials remained on the middle shelf where Plaintiff could reach them. (Vaccaro Dep. 18-19, 37, 75; Merrigan Dep. 79-80, 82-83.) A week later, the pots were back on the top shelf. (Vaccaro Dep. 19.) When confronted, Hunter said he had forgotten. (Vaccaro Dep. 75.) Husenica then gave Hunter a written warning not to put the pots on the top shelf again. (Vaccaro Dep. 19.) After that, Vaccaro never noticed the pots out of place again, and Plaintiff's complaints about the pots stopped. (Vaccaro Dep. 19, 95-96.)

Husenica held a monthly staff meeting on November 7, 2005, to address customer service, the need for teamwork and to alleviate the tension among his employees, many of whom

6

were not talking to one another.  (Husenica Dep. 56-58; Merrigan Dep. 84, 88-89, 91-92, 128.)

During the meeting, all employees signed a document acknowledging internal staff tensions that

were affecting customer service.  (Husenica Dep. 56; Def.'s Ex. D, Internal Issues Statement,

Nov.7, 2005.)

On November 10, 2005, Husenica met with Plaintiff and Carol Hartman, another female

ARAMARK employee, about their concerns about their safety due to Copling's words and

behavior.  (Merrigan Dep. 94-97; Husenica Dep. 81-82; Def.'s Ex. E, Husenica's Notes,

Employee Meeting, Nov. 10, 2005 ("Mtg. Notes, Nov. 10, 2005.")[2]  The women complained that

Copling had given them intimidating and threatening looks and that he had jokingly said he

would bring his "boys" and use knives to straighten out a situation with Hartman's boyfriend.

(Mtg. Notes, Nov. 10, 2005; Merrigan Dep. II at 98-99.)  The women also reported to Husenica

that Copling had told customers not to eat the food prepared by the Chef because it was four

weeks old, and that he would not eat the food himself.  (Husenica Dep. 83, Mtg. Notes, Nov. 10,

2005; Merrigan Dep. II at 99.)  Plaintiff also told Husenica that Copling was turning some

customers away.  (Merrigan Dep. II 102-03; Mtg. Notes, Nov. 10, 2005.)  Husenica spoke with

Copling about the complaints and documented the meeting in Copling's file.  (Husenica Dep. 83,

85.)

November 11, 2005, Husenica met with Plaintiff and offered her a transfer to another

ARAMARK account at Charming Shoppes in Bensalem, Pennsylvania.  (Husenica Dep. 49-51,

67-69, 73; Merrigan Dep. 105-106; Def. Ex. G, Employee Meeting with Merrigan Notes, Nov.

_____

[2] After the meeting, Husenica spoke by telephone to ARAMARK employee Diane
Williams, who, along with Plaintiff and Hartman, had requested the meeting.  (Husenica Dep.
81-82; Merrigan Dep. 95.)

11, 2005.)  Plaintiff had requested that either she or Copling be transferred out of the NFL Films

location because she could no longer work with Copling.  (Husenica Dep. 50.)  Husenica thought

the Charming Shoppes position was a better fit for Plaintiff than for Copling, so he offered it to

her first.  (Husenica Dep. 53.)  The Charming Shoppes location was only five minutes from

Plaintiff's home.  (Merrigan. Dep. 108-109.)  Plaintiff did not accept the transfer because she

believed the Charming Shoppes account might be lost by ARAMARK and had heard Vaccaro

complaining about that account.  (Merrigan Dep. II at 107-109.)  Plaintiff was very upset about

being offered the transfer.  (Husenica Dep. 52.)  After this meeting, Plaintiff said to Husenica, "I

am so upset right now[.]  I can't believe that you cannot provide a safe working environment for

me and the rest of your staff.  You know what, I'm done.  I'm done with this.  I'm taking matters

into my own hands."  (Husenica Dep. 73.  See also Husenica Dep. 52, 70.)  She then stormed out

of Husenica's office.  (Husenica Dep. 70, 73.)

     After Plaintiff declined the Charming Shoppes transfer, Husenica offered the transfer to

Copling, who had also asked for a transfer, but Copling declined because he had to rely on public

transportation and he lived in southern New Jersey.  (Husenica Dep. 51-53, 71, 191-192.)

Copling did not react in an angry or upset manner when he was offered the Charming Shoppes

transfer.  (Husenica Dep. 52-53.)

     On November 21, 2005, Plaintiff met privately with Husenica and reported that she felt

Copling had harassed her that day by telling customers to give her a hard time and make snide

comments to her.  (Merrigan Dep. 117-118; Husenica Dep. 85, 87; Def.'s Ex. F, Husenica's

Notes, Meeting with Merrigan, Nov. 21, 2005 ("Meeting Notes, Nov. 21, 2005").)  Plaintiff also

reported that Copling was not working with her at the end of the day because, on several

occasions, he had taken the cart to the dish area before allowing her to load her equipment, and she reported her belief that Copling had purposely used D-Lime the previous Friday to make her sick.  (Meeting Notes, Nov. 21, 2005; Merrigan Dep. 73-75.)[3]  Husenica addressed the D-Lime issue with Copling, instructed him not to use that solution because it was a safety hazard, and documented the meeting.  (Husenica Dep. 75, 88, 189; Merrigan Dep. 73-74.)  Husenica saw the D-Lime incident as a safety issue, not an employee interaction problem, because sometimes the employees used strong cleaning solutions to clean their equipment.  (Husenica Dep. 75-77, 189-190.)  That was the first time the D-Lime issue had been brought to Husenica's attention, and, to Husenica's knowledge, Copling never used D-Lime again.  (Husenica Dep. 88-89, 189.)

In November or early December, Plaintiff complained to Husenica that situations with Copling and Hunter were getting worse, not better.  (Merrigan Dep. 83-84.)  In response, Husenica called a staff meeting to try to get all the employees to get along, but things continued to get worse.  (Merrigan Dep. II 84-85.)

On December 5, 2005, District Manager Michael Churback held a staff meeting at the NFL Films location about the increase in staff tension and how that was affecting customer service.  (Merrigan Dep. 159-160.)  After the meeting, Churback met privately with Plaintiff and another female employee.  (Merrigan Dep. 160-61; Husenica Dep. 94.)  Around December 15, 2005, Churback held another staff meeting about customer service issues.  (Merrigan Dep. 162-163; Merrigan Dep. 130-31.)  After this meeting, Plaintiff met privately with Churback and expressed her concerns about Copling and Hunter.  (Merrigan Dep. 162-163; Merrigan Dep. II

---

[3] Copling also used D-Lime on one prior occasion, before September 5, 2005.  (Merrigan Dep. 75-77.)  He was told not to use it because the strong odor bothered everyone.  (Merrigan Dep. 75-76.)

130-32.)  Churback said he was well aware of Plaintiff's complaints.  (Merrigan Dep. II 132.)

Plaintiff got upset and started to cry, and she told Churback that she did not want to lose her job

and did not want to transfer locations.  (Merrigan Dep. II 133.)  Churback responded that he

would talk to the rest of the staff and that someone would be transferred.  (Merrigan Dep. II 133-

34.)

On January 11 and January 16, 2006, Plaintiff again complained to Husenica and Vaccaro

about dirty looks and about her supplies and equipment being placed on out-of-reach shelves.

(Merrigan Dep. 164-166.)  Upon Churback's suggestion, Husenica told Plaintiff that he wanted

to have a meeting with Vaccaro, Plaintiff, Copling and Hunter.  (Merrigan Dep. 167.)  Plaintiff

told Husenica that she thought that any such meeting would make the situation worse for her.

(Merrigan Dep. II 167.)  Plaintiff was concerned that Copling and Hunter would gang up on her

and say that there were no problems, and Plaintiff thought she would be forced to tell Copling

and Hunter that she felt threatened by them.  (Merrigan Dep. II 172-183.)  According to

Husenica, the intent of the meeting was not to blame or discipline anyone but to create "an

opportunity to work together to resolve the situation."  (Husenica Dep. 104-106.)

Husenica scheduled the meeting for January 19, 2006.  (Merrigan Dep. 180; Husenica

Dep. 103-104; Vaccaro Dep. 27; Merrigan Dep. II 169.)  On that date, he asked Copling and

Hunter to join the meeting, and Copling and hunter agreed to do so.  (Husenica Dep. 104.)  When

Husenica spoke to Plaintiff about the meeting, he said he and Vaccaro would be present to

mediate but otherwise would not speak.  (Merrigan Dep. II 169.)  Plaintiff told Husenica that she

did not feel safe or comfortable attending such a meeting, and she refused to attend.  (Merrigan

Dep. II 172-73, 175, 183-85; Husenica Dep. 104.)  Construing Plaintiff's refusal to participate in

the meeting as insubordination, as described by the ARAMARK Handbook, Husenica called

Churbuck who, along with Vaccaro, agreed to terminate Plaintiff's employment. (Husenica Dep.

110-11; Vaccaro Dep. 79-80; Employee Handbook 16-17 (defining insubordination as "refusal to

perform any job or work assignment given by an employee's Manager or by other designated

management".) Vaccaro believed the decision to terminate Plaintiff was justified because of the

write-ups in her file. (Vaccaro Dep. 35, 39.) Husenica then informed Plaintiff that she was being

fired for insubordination. (Merrigan Dep. 178, 180, 182, 184; Vaccaro Dep. 35; Def.'s Ex. H,

Employee Meeting Notes, Jan. 19, 2006.) In the Employee Handbook, insubordination falls in

the category of employee conduct constituting "[s]erious offenses which will call for strong

disciplinary action, and possibly discharge." (Employee Handbook 16.) After Husenica told

Plaintiff she was being terminated, Plaintiff said she did not intend to disobey an order, and she

proposed an alternative meeting format that would not require her to face Copling and Hunter

together. (Merrigan Dep. II 182-83.) Husenica apparently did not accept that proposal.

On April 21, 2006 – seven months after Plaintiff accused Copling of theft – Copling was

fired after Vaccaro suspected that someone had been in his car. (Vaccaro Dep. II 46-48;

Husenica Dep. II 168-169.) Security surveillance cameras showed Copling smoking a cigarette

in Vaccaro's car, from which nothing was missing. (Vaccaro Dep. II 47-48; Husenica Dep. II

169.)

Plaintiff filed a complaint of harassment in September or October 2006. Plaintiff filed a

Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on

March 16, 2006. (Compl. ¶ 9, Ex. A, EEOC Charge of Discrimination.) Plaintiff received her

right to sue letter from the EEOC on September 8, 2006. (Compl. ¶ 10; Pl.'s Resp., Ex. B,

EEOC Dismissal and Notice of Rights Letter.)


**III.    Standard of Review**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a summary judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Fed. R. Civ. P. 56(c).  In order to defeat a motion for summary judgment, disputes must

be both (1) material, meaning concerning facts that will affect the outcome of the issue under

substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could

return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  Celotex, 477 U.S. at 322-23.  An issue is genuine if the fact

finder could reasonably return a verdict in favor of the non-moving party with respect to that

issue.  Anderson, 477 U.S. at 248.

"In an employment discrimination case, the burden of persuasion on summary judgment

remains unalterably with the employer as movant.  The employer must persuade [the court] that,

even if all of the inferences which could reasonably be drawn from the evidentiary materials of

record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in

the plaintiff's favor."  Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 362 (3d Cir. 2008)

(citations omitted).  In reviewing a motion for summary judgment, the court "does not make

credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." <u>Seigel Transfer, Inc. v. Carrier Express, Inc.</u>, 54 F.3d 1125, 1127 (3d Cir. 1995).

## IV.    Discussion

### A.    Unlawful Termination

Plaintiff alleges that ARAMARK unlawfullly terminated her employment because of her race and gender.  Under Title VII, it is unlawful for an employer "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (2003).  Because Plaintiff presents only circumstantial evidence of wrongful discharge based on race and sex, the McDonnell Douglas burden-shifting framework governs.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410 (3d Cir. 1999).  This analysis has three component parts.  First, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 801-802.  Second, if the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  If the defendant is able to carry that burden, the burden of proof shift back to the plaintiff to show that the defendant's proffered reasons are pretextual.  <u>McDonnell Douglas</u>, 411 U.S. at 801-04; <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981).

### 1.    Plaintiff has Made a *Prima Facie* Case of Wrongful Termination

#### a.    *Race*

Here, Plaintiff is White.  Nonetheless, she is entitled to the protections of Title VII.

13

McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 (1976); Iadimarco v. Runyon, 190

F.3d 151, 158 (3d Cir. 1999) ("[I]t is now clear that the dictates of Title VII are not limited to

discrimination against members of any particular race and Title VII proscribes racial

discrimination in private employment against Whites on the same terms as racial discrimination

against nonwhites.") (internal quotations, citations, and alterations omitted).  The McDonnell

Douglas burden-shifting analysis also applies to "reverse discrimination" suits, or Title VII suits

by White plaintiffs alleging racial discrimination.  In the Third Circuit, a plaintiff who brings a

reverse discrimination claim must establish a *prima facie* case by "present[ing] sufficient

evidence to allow a fact finder to conclude that the employer is treating some people less

favorably than others based upon a trait that is protected under Title VII."  Iadimarco, 190 F.3d at

161.  Therefore, in this case, Plaintiff must present sufficient evidence that she was treated less

favorably than similarly-situated non-White ARAMARK employees because of her race.  See id.

at 165 ("[T]he inquiry is not whether [the supervisors] discriminated against Whites in general,

but whether they illegally discriminated against [this plaintiff].").

  Plaintiff has made a *prima facie* case of racial discrimination because she has presented

evidence that non-White employees were not terminated after engaging in serious offenses.

Plaintiff was terminated after an action that her supervisors considered to be insubordination.

Plaintiff has not claimed that Copling, Hunter, or any other non-White ARAMARK employee

retained his or her employment despite insubordination.  However, she "need not establish that

precise kind of disparate treatment to establish a claim of discrimination."  Sarullo v. U.S. Postal

Service, 352 F.3d 789, 797 (3d Cir. 2003).  Plaintiff has presented evidence that non-White

ARAMARK employees engaged in behavior in the same Employee Handbook category of

14

"serious offenses" but were not terminated.   Husenica admitted that Copling's use of D-Lime constituted the serious offense of violating a safety practice.  (Husenica Dep. II at 111-12; Employee Handbook 16-17.)  Husenica also admitted that, if true, some of Plaintiff's allegations regarding Copling would constitute the serious offense of "use of profane or abusive language, where the language used is uncivil, insulting, contemptuous or harassing."  (Husenica Dep. II at 112-19, 133-37; Employee Handbook 16-17.)  In addition, Plaintiff has presented evidence that Hunter and Copling engaged in behavior that could be considered the serious offense of "[t]hreatening, intimidating, coercing or interfering with fellow employees on Company and/or client premises."  (Employee Handbook 16-17.)  Finally, Plaintiff has presented evidence that Husenica would not accuse Copling of theft – an offense that, according to the Employee Handbook, may result in immediate discharge – because that accusation could cause "a racial issue."  (See Employee Handbook 16.)  Considering all of this evidence, drawing all inferences in the light most favorable to Plaintiff, and remaining "[m]indful that the plaintiff's burden at this first stage is not particularly onerous," the Court concludes that Plaintiff has established a *prima facie* case of racial discrimination.

> b.      *Sex*

Likewise, Plaintiff has made a *prima facie* case of wrongful termination due to sex discrimination.  To establish a *prima facie* case of wrongful termination based on sex, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; and (3) she was discharged under conditions that give rise to an inference of unlawful discrimination.  See Geraci v. Moody-Tottrup, Intern., Inc., 82 F.3d 578, 580-81 (3d Cir. 1996). As a woman, Plaintiff belongs to a protected class.  There is no dispute about whether she was

qualified for her position at ARAMARK, from which she was terminated for insubordination. Plaintiff has put forth some evidence that Copling and Hunter – two male employees – were not terminated despite their apparent serious offenses.  The Court finds that Plaintiff has satisfied her initial burden.

### 2.    Defendant has Articulated a Legitimate Non-Discriminatory Reason for Plaintiff's Termination

Defendant rebuts Plaintiff's *prima facie* case of discrimination with a legitimate non-discriminatory reason for her termination: insubordination.  By refusing to participate in an employer-mandated meeting, Plaintiff was insubordinate.  The Court finds that Plaintiff's insubordination is a legitimate non-discriminatory reason for her termination, thus shifting the burden back to Plaintiff to demonstrate pretext.  Burdine, 450 U.S. at 254-55; Hicks, 509 U.S. at 506-07.

### 3.    Plaintiff has Failed to Present Evidence of Pretext

When a defendant meets its burden of articulating a legitimate non-discriminatory reason for an adverse employment action, "the court's 'factual inquiry then proceeds to a new level of specificity.' "  Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981)).  "The presumption of discrimination established by the *prima facie* showing 'simply drops out of the picture'" and the plaintiff must show that the legitimate reason offered by the defendant is pretextual.  C.A.R.S., 527 F.3d at 370 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).

> In order to show pretext, a plaintiff must submit evidence which (1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination was more likely than not a motivating or

16

> determinative cause of the employee's termination.  Put another
> way, to avoid summary judgment, the plaintiff's evidence rebutting
> the employer's proffered legitimate reasons must allow a
> fact-finder reasonably to infer that each of the employer's proffered
> non-discriminatory reasons was either a *post hoc* fabrication or
> otherwise did not actually motivate the employment action (that is,
> that the proffered reason is a pretext).

C.A.R.S., 527 F.3d at 370 (citations omitted).  The plaintiff retains the ultimate burden of

persuading the trier of fact that he or she has been the victim of intentional discrimination.

Hicks, 509 U.S. at 508.

Plaintiff has not offered any evidence or argument that ARAMARK's legitimate non-

discriminatory reason for terminating her was pretext for discriminatory animus based on race or

sex.  Plaintiff does not rebut that the Employee Handbook permits discharge for insubordination.

Plaintiff argues only that ARAMARK terminated her without first following its own "policy of

progressive discipline."  (Pl.'s Opp'n 16.)  However, Plaintiff has not established the existence of

a progressive discipline policy or presented any evidence that her supervisors' reasons for not

following the purported policy were discriminatory.  Plaintiff also argues that ARAMARK did

not respond properly to her complaints about workplace harassment or to her allegations

regarding Copling's alleged theft of September 5, 2005.  Here, again, Plaintiff's disagreement

with her supervisors' decisions do not demonstrate discriminatory animus.  "To discredit the

employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision

was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus

motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."

Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

Because Plaintiff has not presented any evidence that discriminatory animus motivated

17

her supervisors' decision to terminate her, the Court finds that no reasonable factfinder could conclude that ARAMARK's legitimate non-discriminatory reason was pretext for unlawful race or sex discrimination.  Thus, the Court shall grant judgment in favor of ARAMARK and against Plaintiff on Plaintiff's unlawful termination claims.

### B.      Sexual Harassment

"A plaintiff may . . . establish that an employer violated Title VII by proving that sexual harassment created a hostile work environment" Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d Cir. 2009).  A hostile work environment violates Title VII "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  To establish a Title VII hostile work environment claim, a plaintiff must prove (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person of the same sex in the same position; and (5) the existence of *respondeat superior* liability.  Id.  When the hostile work environment is created by a plaintiff's non-supervisory coworkers, the employer is only liable if it "was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment."  Id.

Although Plaintiff has presented considerable evidence of harassment by Copling and Hunter, she has presented no evidence whatsoever that she was harassed *because of her sex*. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998).  She has presented no

evidence that Copling and Hunter's behavior was motivated by sexual desire, had sexual connotations, or included any sex-specific terms.  This evidence is not required if a plaintiff seeks to prove sexual harassment with "comparative evidence about how the harassers treated members of both sexes in a mixed-sex workplace."  Id.  However Plaintiff has not done so.  She has presented evidence that other female ARAMARK employees had problems with Copling and Hunter, but she has not provided comparative evidence of Copling and Hunter's treatment of male ARAMARK employees.  Plaintiff also testified in her deposition that she did not know why Hunter's behavior toward her changed and that she believed Copling's behavior toward her changed after she accused him of stealing money from her.  (Merrigan Dep. II 57, 173.) According to Plaintiff, "the day before [the theft allegation] things were fine and then the next day after I made my complaint is when things changed."  (Merrigan Dep. II at 57.)  Plaintiff's theory regarding Copling may explain his change in behavior, but it does not support an inference of harassment because of sex.

        The Court has evaluated the totality of the circumstances in this case and has drawn all reasonable inferences in favor of Plaintiff, and it concludes that Plaintiff has failed to establish the existence of a hostile work environment claim actionable under Title VII.  Cardenas v. Massey, 269 F.3d 251, 261-62 (3d Cir. 2001).  The Court shall grant judgment in favor of ARAMARK on Plaintiff's sexual harassment claim.

        **C.      Retaliation**

According to Title VII,

>        It shall be an unlawful employment practice for an employer to
>        discriminate against any of his employees . . . because he has
>        opposed any practice made an unlawful employment practice by
>        this subchapter, or because he has made a charge, testified,

19

assisted, or participated in any manner in an investigation,
proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Opposition to discrimination "can take the form of informal protests of

discriminatory employment practices, including making complaints to management."  Moore v.

City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) (internal quotation and citation omitted).

Under the McDonnell Douglas burden-shifting paradigm, the employee bears the initial

burden of establishing a *prima facie* case of retaliation under Title VII.  See McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973).  The employee must prove that (1) she engaged in a

protected employment activity under Title VII; (2) her employer took an adverse employment

action after or contemporaneous with the protected activity; and (3) a causal link exists between

the adverse action and the protected activity.  Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir.

2007); Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).  If the employee

establishes a prima facie case of retaliation, the burden of production shifts to the employer to

articulate a legitimate, non-retaliatory reason for the adverse employment action.  Marra, 497

F.3d at 300 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997)).  If the

employer meets its burden, the burden of production returns to the employee, who must now

show, by a preponderance of the evidence, that "the employer's proffered explanation was false,

and that retaliation was the real reason for the adverse employment action."  Marra, 497 F.3d at

300 (citations omitted.).

To satisfy the adverse employment action requirement for a prima facie case of

retaliation, "a plaintiff must show that a reasonable employee would have found the challenged

action materially adverse, which . . . means it well might have dissuaded a reasonable worker

from making or supporting a charge of discrimination."  Burlington Northern & Santa Fe Ry. v.

20

White, 548 U.S. 53, 68 (2006) (quotations and citation omitted).  "[P]etty slights, minor annoyances, and simple lack of good manners" that often occur in the workplace do not normally constitute materially adverse employment actions.  Id.  "Context matters" in determining whether a challenged act would have dissuaded a reasonable employee from making or supporting a charge of discrimination, and an "act that would be immaterial in some situations is material in others."  Id. at 69 (quotation omitted).

Here, Plaintiff claims that ARAMARK attempted to transfer her to the Charming Shoppes account and terminated her employment in retaliation for her complaints of discrimination.  (See Pl.'s Opp'n at 9, 11-15.)  Despite ARAMARK's arguments to the contrary, the Court finds that Plaintiff engaged in protected conduct when she complained to her supervisors about Copling and Hunter's treatment of her, thus satisfying the first element of a *prima facie* retaliation claim.  Although the Court has found that Plaintiff's sexual harassment claim fails as a matter of law, the Court cannot conclude that no objectively reasonable person in Plaintiff's position could have believed that Copling and Hunter's behavior was unlawful under Title VII.  See Wilkerson v. New Media Tech. Charter Sch. Inc.  522 F.3d 315, 322 (3d Cir. 2008) ("[I]f no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected."); Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (holding that a plaintiff claiming retaliation "must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII.").  Plaintiff's termination clearly satisfies the second element of a *prima facie* case.  However, ARAMARK's offer to transfer Plaintiff to the Charming Shoppes account is not an adverse employment action because it did not alter the terms, conditions, or

21

privileges of Plaintiff's employment or adversely affect her in any way.  See 42 U.S.C. §

2000e-2(a).  See also, e.g., Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001) (holding

that written reprimands were not adverse employment actions because they did not change or

alter the plaintiff's employment status in any way).

Plaintiff's retaliation claim fails at the third element of the *prima facie* case: causation.  It

is undisputed that Plaintiff complained to her supervisors about Copling and Hunter numerous

times prior to her January 19, 2006, termination, Plaintiff has presented no evidence of a causal

link between her termination and her protected activity.  The timing of the termination is not

suggestive of retaliation, and, even if it were, timing alone very rarely suffices to support

causation.  Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007).  Although a

Plaintiff may rely on "a broad array of evidence" to demonstrate causation, Plaintiff has not

pointed to any evidence in support of causation, and the Court has not found anything in the

summary judgment record that it could use to infer causation.  Farrell v. Planters Lifesavers Co.,

206 F.3d 271, 284 (3d Cir. 2000).

Moreover, even if Plaintiff had made a *prima facie* case of retaliation, Plaintiff has not

demonstrated that ARAMARK's non-discriminatory reason for her termination – *i.e.*,

insubordination – is pretextual.  Therefore, Plaintiff's retaliation claim fails as a matter of law.

**D.     Petition to Withdraw as Counsel for Plaintiff**

The Court finds that Plaintiff's counsel, Nessa B. Math, Esq., has shown good cause why

she should be permitted to withdraw as counsel of record.  The Court will grant Ms. Math's

Petition for Leave to Withdraw.  However, as her last duties in this matter, Ms. Math must (1)

attempt to contact Plaintiff by telephone to communicate the Court's judgment in this matter; (2)

attempt to deliver a copy of this Memorandum and the accompanying Order to Plaintiff via United States mail to Plaintiff's last known address; and (3) file with the Clerk of Court a Statement indicating whether she was able to contact Plaintiff as directed herein.

**V.      Conclusion**

For the foregoing reasons, summary judgment will be granted in favor of ARAMARK and against Plaintiff on all Plaintiff's Title VII claims.  Plaintiff's counsel's Petition for Leave to Withdraw will be granted.

An appropriate Order follows.